Morning, Counsel. Hello. I assume this is counsel for the appellants. Yes, for the government. Brian Boynton for the United States. Good morning. We're here in the case, just hearing one case today, that's the East Bay Sanctuary Covenant v. Biden case. We have it scheduled for 20 minutes per side, so if you could announce your name and how much time you plan to reserve for rebuttal. Great. Brian Boynton from the Department of Justice. I'd like to reserve five minutes for rebuttal. The rule at issue here takes a balanced approach. Its rebuttable presumption encourages asylum seekers to pursue orderly pathways to the United States or to seek protection from third countries where they are able to do so. At the same time, DHS has significantly expanded the orderly pathways available to the United States. Perhaps most important to this appeal the rule is materially different from the rules that this court has previously considered. Before you go into the prior cases, can I just ask, when you talk about pathways, are you talking about pathways to entry or pathways to admissibility or immigration or what? These are pathways to entry where non-citizens can present asylum claims. For example, there's the CBP-1 pathway. When you talk about parole as a pathway, that's usually different, correct? One who gets parole really isn't looking for asylum, is that right? Folks who obtain parole under one of the DHS parole pathways can seek asylum once they're paroled into the country, so we do think of that as a pathway that allows a non-citizen to present an asylum claim, yes. But when one applies for parole at an embassy or wherever outside the country, one doesn't go and say, I want asylum in the United States, therefore give me parole? That's correct, Your Honor. Under the programs that DHS has set up, the non-citizen would seek to show they meet the criteria for those programs. If they do, they can obtain travel authorization, fly into the United States, and then once they're in the United States, if they believe they have an asylum claim, they can make it. Before jumping deep into the merits, I'd like to just quickly talk about the threshold arguments we've made. We've made three arguments about why the plaintiff immigration organizations are not the right plaintiffs to be challenging this rule. They're three different arguments, but they turn on the same essential proposition, that an immigration organization has no judicially cognizable interest in how the immigration laws are applied to non-citizens. This court obviously considered and rejected that argument in the prior cases, but since then the United States Supreme Court has decided a very important case in this area, that's the United States versus Texas, the immigration priorities case. And in that case, the Supreme Court, even though the states who are the plaintiffs there had financial impacts because of the DHS decision at issue, they didn't have a judicially cognizable interest in the case. There's to say the states do not. That's correct. So you're using that argument with respect to states to try to apply it to these organizations, correct? Correct, Your Honor. We think that there's a parallel there, that the organizations say that they've incurred financial harm because of the regulation, the same way the states in U.S. v. Texas said that they had incurred financial harm because of the DHS priorities memo. In both cases, we believe that the plaintiffs don't have a judicially cognizable interest even though they suffer or are alleged to suffer a financial injury. The plaintiffs have argued that U.S. v. Texas is different because that was a case where the plaintiff was seeking greater enforcement of the immigration laws and they're seeking less enforcement of the immigration laws. We don't think that that distinction is material here. The factors that the Supreme Court considered in U.S. v. Texas, whether the plaintiffs themselves are regulated by the rule, whether the financial impacts are merely derivative, the fact that they're challenging a discretionary immigration enforcement decision. After reading United States v. Texas and taking another look at Havens and the arguments that were presented the last time in the earlier opinion, why don't we just follow the rules laid out in Havens? I mean, I didn't really see, I didn't quite capture your argument. We think that U.S. v. Texas has changed the law at least with respect to cases that are challenging discretionary immigration enforcement decisions. We don't contend that Havens has been overruled in its entirety, but in these circumstances, we think the considerations the court considered there also cut against standing for the plaintiffs. And standing, you're saying there's no Article III standing, or is this a prudential argument you're making? We think it's both. U.S. v. Texas was an Article III standing case, and we think that it undermines the plaintiff's Article III standing here, but we think the same principle explained why they're not within the zone of interest of the INA. If I could, I'd like to turn to the merits. The district court thought that this rule was indistinguishable from the prior rules. We respectfully disagree. We think this rule is quite different in a few respects. First of all, it's not categorical. It has a robust set of exceptions. One of those exceptions, as we discussed briefly, is for people who make an appointment with the CBP-1 app. That is a very robust exception. Every day, 1,450 people are able to make an appointment at a port of entry. Over the course of a year, that's over 500,000 people who can make an appointment. The record indicates that that's four times more people who are able to present at a port of entry than during the pre-pandemic period before the CBP-1 app was available because of the efficiencies caused by the app. In addition, there's the parole process. So that's a pathway. Correct. That's a way for a noncitizen with an asylum claim to bring their claim forward and to avoid the rebuttable presumption. So previously, if you wanted to enter through a port of entry, you stood in line? Has that gotten a really long line? Now does it do you any good to get in a line? You need to have an appointment? Correct. There's no need to wait in lines. So under the old rule, if I remember correctly, if you were standing in line and you entered a port of entry, that was an exception, correct? For the entry bar rule, correct. That was an exception for the transit. Here, if you stand in line for a very long time, but you don't make an appointment, you're out of luck, unless you meet one of the other exceptions. And there's an exception where you're unable to make an appointment with the CBP-1 app if you have a language barrier? What I'm trying to figure out is you're characterizing the fact that we have an app and the other rule didn't have an app, but you also are missing something. The other rule, if you stood in line and just waited, you didn't have to meet one of these other exceptions. That was a pathway. So you've kind of closed that pathway, but you've created this other pathway. There are other pathways, but additionally, even the port of entry pathway is now broader because there are four times more slots at ports of entry now because of the efficiencies due to the app. And that's in the Nunez-Nieto Declaration in the excerpts of record that show that. So it's actually broader, even if you're looking at ports of entry. But there are also the other exceptions. The parole exception is quite broad. 30,000 people per month are eligible for the CHNV parole process exception. That's Cuba, Haiti, Nicaragua, Venezuela. That's 360,000 people. But that strikes me. I found it interesting that you would treat parole, and I don't mean to dwell on parole, but it struck me as a little odd that you would be focusing on parole as a pathway, when if somebody's really claiming they've been persecuted in their country, it doesn't make much sense to me that they would suddenly go over and try to fill out all the forms at the embassy and do whatever they needed to do to apply for parole and wait for somebody in the United States who can sponsor them and all that. I mean, it doesn't really seem like it's a real meaningful option for somebody who's suffering persecution and wants to escape their country. So we think it's actually a very good first option. A person can do that from their home country. They don't have to travel to the border.  Not when they're in trouble in their home country. That's the premise. I take your point, Your Honor, and the way the rule is set up, there are various different pathways, and so people can decide what pathway makes the most sense for them. If they're able to seek parole, then they can do that. If they're not, then they need to pursue one of the other pathways. What happens if somebody comes to the border, to a port of entry, and for some reason or other, they get to speak to a customs officer at the border, and they say, do you have an appointment? The person says, no. Well, did you know you needed an appointment? The person says, no. I don't even have an iPhone. How is it then determined whether or not they might meet the exception of unreasonable, compelling circumstances? What happens? Does the customs officer engage with them, or is there a process they're then routed through to determine whether or not they meet that exception? So if this is a non-citizen without documentation to enter, they could well be put into expedited removal, where they would then have an opportunity to claim fear or indicate that they intend to apply for asylum. If they do that, then they would go before an asylum officer for a credible fear interview. The asylum officer would interview the person, ask questions to gain the relevant facts, and then make a determination about whether the rule applies or whether the person has fallen within an exception or can rebut the presumption. The rebuttal grounds are quite important here. The plaintiffs have portrayed the rebuttal grounds as being vanishingly narrow. The record establishes, however, that in the first month the rule was applied, 8% of the people in expedited removal who were subject to the rule's presumption were able to rebut it. A declaration we filed more recently in a companion challenge, filed by the ACLU to the rule in D.C., the M.A. case, has data that goes through September, and through September the percentage is 12% of people were able to rebut the rule. So it's also a robust rebuttal mechanism. Another way the rule is different... Are these people, maybe you don't know this, but are these people, in theory you could be rebutting the rule because Judge Piazza's hypothetical, they show up, but they don't have an appointment, but they're showing up at a port of entry, and are they rebutting it there, or are most of these people entering not at a port of entry, and then rebutting it at that point? So the statistics I gave you are for people who are placed into expedited removal. Those are people who either crossed between ports of entry or appeared at a port of entry, presented in the hypothetical, but didn't have... Yeah, that's what I'm asking. So it could be either. But do you know which, is it mostly the latter, or you don't know? I assume that most of the people, that more of the people would be between ports of entry. I don't have that data in front of me, but that's just an assumption, given the numbers of people who cross between ports of entry and the numbers who appear at a port without a CBP-1 exception. The other way this rule is quite different from the prior rule is the purpose the rule is intended to serve. In the transit rule case, this court faulted the departments for promulgating a rule that was intended to weed out invalid claims. The departments had reasoned that people who failed to present a claim for protection in a transit country must therefore have weak asylum claims, and the court indicated that they thought there wasn't a basis for that. That is not the basis for the current rule. The current rule seeks to improve the efficiency of the entire hemispheric immigration system. That kind of systemic efficiency rationale is one... How is it supposed to improve that efficiency? It's supposed to improve that efficiency by providing incentives for people to pursue countries where they're able to do so. Where they're not able to do so, then they can seek to rebut the presumption... Let me ask a slightly different question. I got your argument, and you laid it out well in your plybrief. I'm just a little bit surprised because it seems like the way it purports to gain efficiencies is by, as you acknowledge, by actually... There may be people that actually have legitimate asylum claims, but better end up not being able to present them under your rule. It's great to see that you straightforwardly acknowledge that, but how does that not run headlong into our precedent that basically said, hey, the prior rule was saying that people had to pretty much enter at an entry point, and if they didn't, they... The statute says that you don't have to, and it said there was a... Right now, you're going a step further almost in saying, well, we acknowledge that there's some people with legitimate asylum claims, and they're just going to not be able to press them. How does that not run into, I guess, East Bay, whatever you want to call it, the entry rule case? You're correct, Your Honor, that the rule does straightforwardly acknowledge that there will be some people who meet the definition of a refugee, but will not be able to obtain asylum because they don't comply with the rule. That's inherent in any limitation on asylum. 1158B2C expressly grants the departments the authority to impose new limits that are not in the statute. That necessarily is going to contract... But as I read our precedent, it says that, yes, you can put limits, but those limits have to be consistent with, and it's not consistent with, if you are barring people that entered between ports of entry. And so how do you not run into that? I understand you're saying, yeah, but we're doing it to be efficient. We're not doing it to weed out. But whatever reason you're doing it, how does that not run into that precedent? So the difference is, is that the entry bar was a categorical bar that said that anyone who crosses between ports of entry was not eligible for asylum. And this court, I see that my light just came on, so I'll sit down momentarily. This court said that that kind of categorical bar was inconsistent with 1158A1, because A1 says anyone who's non-citizen can apply for asylum regardless of whether they've crossed at a port of entry or between them. If you then have a rule that says no one who crosses between ports of entry can obtain asylum, the court thought that was inconsistent with the right to apply. This is different, though, because there are a large number of people who cross between ports of entry who will be able to still seek asylum because they'll fall within one of the exceptions, or they'll be able to rebut the presumption. My light has come on. No, no, go ahead. I want to make sure that my colleagues get that. Assuming that they do cross between a port of entry, you've also got the transit bar, right? So, I mean, they've got to do two things. They've got to get past both of those. So that's not correct, Your Honor. It's an or, not an and. Right? So if they pursue any of the pathways, they can get in. So someone, if they obtain parole from their home country, they are an exception there. You mean the rule doesn't apply to them? The presumption doesn't apply to them? Correct. If someone seeks asylum in a transit country and is denied asylum, they don't have to be granted asylum. They just have to seek it and be denied. Then the rule doesn't apply. Say someone doesn't do either of those things. They don't seek parole. They don't apply in a transit country. They instead seek and obtain a CBP-1 app appointment. As long as they've pursued one of the exceptions, the rebuttable presumption doesn't apply to them. I understood that. I was thinking about it. It seemed a little bit odd to me, though. I go and I go through this long, arduous process to seek asylum and get denied. Let's say it takes a year and a half in Mexico, right? The stats are eight to 12 months on average. Eight to 12 months. All right. And then I guess the idea would be, so I just head straight for the border and don't go to a port of entry. It's sort of like a, now I can enter, not at a port of entry. But it's hard for me to see people, whoever's diligent enough to do that, you think they would just go, you know what? I need to do all this. Then you think they would enter at a port of entry or use the app. So I don't know, Your Honor. Some probably would. The reason I'm bringing that up is because, and don't worry about your time. We'll make sure you have plenty of time for rebuttal. But it's an important case. The reason is because you're characterizing these things as exceptions that sort of ameliorate the categorical nature of the entry bar. But I'm just trying to think of how much of an exception is that? How many people in real life are showing up not at a port of entry and are like, well, guess what? I actually applied for asylum 12 months ago and have been denied. I've got to think that that is an infinitesimally small number of people. So right now, the data indicates that that is a smaller exception than the CBP-1 exception or the parole exception. The data for the first month of the rule, which is in the Nunez-Nieto Declaration in the excerpts of record, and this is at ER 47, I believe, indicates that combined the transit denial exception plus the exception for when the app isn't working and so you And I understand your argument is that that might grow as time goes on because you have time for people. Correct. But that doesn't intuit. I mean, I'm not an expert on this, but it doesn't intuit with me because, again, I'm just not expecting a lot of people that are crossing between ports of entry are probably like, you know, well, 12 months ago I applied for asylum in Mexico. But can I ask you another question? Because I'm trying to get at these exceptions and how much the parole exception that Judge the prior rule, the prior entry rule, wasn't it possible for people, there was a, it was possible to apply for parole then also, right? And if you, and I'm trying to remember, if you were granted parole and you flew into some interior city and so you weren't crossing through the border by land, did the prior entry rule bar you from seeking asylum when you flew in? No, it did not. So in that sense, like, it's not just, no, so that's what I thought. So it's not clear to me how that exception distinguishes this rule, the 30,000 people a month you're saying. So the most significant difference is that this program, the CHNV parole process, didn't exist when the prior rule was in place. So you're saying you've created, there's a lot more numbers available for the parole program. Correct. This is now 360,000 people each year who have a pathway to the United States that didn't exist previously. When you add that with the CBP-1 app appointments, you're at almost 900,000 people a year who have a pathway to the United States. So that's a very significant difference from under the prior rules. Gotcha. I think so. It's a pathway to entry. Correct. Let me ask you, why don't you just address your vacator injunction argument? Yes. Before you sit down. Yes, I'm happy to, Your Honor. Thank you. Your Honor, this Court's precedents recognize that while vacator is an available remedy under the APA, it is not a mandatory remedy in every case. That this Court will consider equitable considerations in deciding whether to vacate. That's most clear when the Court decides to remand without vacator, applying a two-part test that looks at whether the consequences of vacator would be disruptive and whether the deficiencies the Court has found are likely ones that the agency can cure. We think that that standard is met here. Vacating the rule would be highly disruptive. And depending on, we're now hypothesizing that you found flaws in the rule. If those flaws were ones of reasoning or any of the procedural flaws the plaintiff's appointed to, that would very clearly be something the agency could cure. And so remand without vacator would be the right option. But even if you weren't in that bucket of remand without vacature, we think the equities here are so strong, it would be so disruptive to vacate the rule. And on the flip side, the harm to the plaintiffs, which are not non-citizens but are immigration organizations, it's a harm to their resources and their budgets. And yes, it's a real harm, but it's not the same kind of irreparable injury that is on the other side. And it's a harm they've been living with now since May. And so we think that in these circumstances, the equities cut against vacature. Okay. Do either of my colleagues have further questions? At this point, no. No. Okay. We'll definitely give you plenty of time.  Appreciate it. Good afternoon. May it please the Court. I'm Spencer Amder for the Plaintiffs. I'd like to briefly address the government's standing arguments, and then I'll turn to the merits. We think on both, this Court has already resolved the major substantive and procedural issues in this case, and that the government can't get out from under any of this Court's prior holdings. So the Supreme Court's Texas decision doesn't overturn this Court's standing precedent, because Texas addressed a unique situation when plaintiffs challenged the government's arrest and prosecution policies. And the opinion says repeatedly that it's only looking at that. So Footnote 5, for instance, says, this case concerns only arrest and prosecution policies, and we therefore address only that issue. And that doesn't apply here, because we're challenging a substantive immigration rule about who's eligible for a particular immigration status. Texas, at the end of the opinion, says that's a completely different thing. Under this Court's Miller principle, Texas could only overturn the prior standing decisions if it was clearly irreconcilable with those decisions. And given that it turned on distinct principles of prosecutorial discretion that aren't at issue here, and given its express reservation that it's only addressing arrest and prosecution policies, it doesn't come anywhere near meeting the Miller standard. Unless there are further questions on the threshold issues, turning to the merits, this Court has already held that the government can't require asylum seekers to enter at ports, and it held that the government can't require asylum seekers to apply in transit countries without the protections in the statute. Now, those principles are fatal to this rule, because this rule simply requires asylum seekers to choose between those same two illegal requirements, subject only to a narrow exception, essentially for extreme emergencies. The government can't make people choose between requirements that it can't impose in the first place. Now, the government's main defense of the rule on the merits is that it's not categorical, because it offers more options this time. But the problem with the prior rules was not that they were categorical. In fact, the transit ban wasn't categorical. It contained an exception for trafficking victims. The problem with the prior bans is that they barred people from asylum for reasons that Congress provided are not valid reasons to bar asylum. People can't be barred based on where they enter the country. People can't be barred for mere transit through third countries. This rule continues to bar people on those exact same bases, and that remains true even if it exempts some people this time from the illegal bar, and even if it bars people on two invalid bases this time instead of one. Those differences don't change the fact that this rule continues to bar people for reasons that Congress provided in the asylum statute are not good enough reasons to stop somebody from seeking asylum. So the government says, well, what we've done is we've created a presumption of ineligibility. There's no bar. It's just a presumption. And there's ways you can rebut this presumption or get accepted from the presumption. Does that make it any different? It doesn't make a difference because whatever the terminology, whether you want to call this two alternative requirements with a narrow exception or you want to call it a presumption with exceptions and rebuttal grounds, I don't think there's any real disagreement about the actual operation of the rule, which is that you're ineligible for asylum unless you comply with one of these two conditions. You need to enter at a port or you need to seek asylum in a third country. And if not, you have to satisfy this emergency exception. So I don't think the government's claiming that this language of presumption actually changes the way it operates in practice. And so can I ask a question about eligibility versus discretion? You know, the statute gives the Attorney General broad discretion. But if I recall correctly, our prior precedents basically say, well, that discretionary question comes after eligibility. And that's why. And this is all about eligibility. And so you can't sort of smuggle that discretion in to have something that's contrary to what the statute requires. And I think maybe even, if I remember your briefing, may concede that at that discretionary stage, at that later discretionary stage, the Attorney General could take into an account in making a discretionary decision on asylum whether or not, what the mode of entry was, whether somebody entered at a port of entry or not. Am I correct on all that? That's correct. So the question I've got is, it just seems kind of odd that they can only take it into account then, but the government can't take it into account earlier. And maybe that our precedent, you know, already has answered this question. But in theory, why couldn't the Attorney General say, okay, you're eligible, but I'm going to, as an exercise of my discretion on the tail end, basically tell you now, I'm not going to give anybody asylum who didn't enter. And if they could do that, then the question is, why can't they sort of cut out the middle man, so to speak, and do that earlier? Let me give two answers, Your Honor. So first, there's a good textual reason that that's this Court's precedent, which is that 1158B2C, which authorizes eligibility bars, it limits those bars in that they have to be consistent with every provision in the asylum statute. And there's no textual limit like that on the discretionary decision at the end. But there's a good reason for that, which is that allowing somebody to apply and avoiding this bar based on this one factor allows somebody to present all the factors in their case. They have to be able to make their whole case. And then at the end, in the discretionary decision, the decision maker has to take all of those into account holistically. And so... And that's... Is that... The decision maker has to take that into account, and that's reviewable by our Court? Or as I'm trying to remember, are we barred? Is that discretionary decision reviewable? If somebody was to challenge and say, I think I put too much weight on the fact that I didn't enter at a port of entry. I'm not sure, actually, the reviewability dynamics on the back end. It might be reviewed for abuse of discretion, but I'm not sure. Here's what I would say, though. In PULA, which governs those decisions, the BIA itself says that you couldn't bar somebody just based on their manner of entry. It says that you have to consider this long list of holistic factors, and that even the circumvention of all possible immigration channels taken together, even that, not only is it not a basis by itself to deny somebody discretion... Right. But I guess that... I mean, that could be. But in theory, the government could change its mind. The BIA could issue... It could come to a different conclusion. Say, you know, now we've changed our mind, and actually... It's important enough for the orderly process, same basis for this rule. It's important enough to channel people through the right channels that we are now going to say, you can rely on that solely. Well, that would be a different case, but I'm not even sure that's true. If they issued a rule that was tantamount to creating an eligibility bar, but they just called it something else, I don't know that that would be consistent with the limits on the government's eligibility authority. Well, the reason I'm asking these questions is because if they could do that, then it's kind of a question of why... You know, if it's possible for them to do that, it seems kind of odd to say, yeah, but you have to wait until that last step to do it. You can't do it earlier on. It seems inefficient for everybody, in a sense, to do that. Well, Your Honor, I think what this Court said in the prior cases, though, is that it's just a different analysis at the two stages. You know, that you can't stop people from presenting their case just because a factor can be taken into account at the end of the case in the exercise of discretion. And, you know, I'll just say PULA has you consider so many factors. I mean, the government has to consider the persecution in the home country, the options in the transit country, ties to the United States. It's very different from this rule. If I can, I'd like to also highlight a second reason, getting to the numbers, why this rule violates the statute. And in some ways, it's even simpler, because it's a reason that this rule is invalid, even just under East Bay 1, the Court's entry rule decision. And that is that, in practice, it's clear that for people at the border who are subject to this rule, the overwhelming majority of them can only be eligible for asylum if they enter at a port of entry. And so it straightforwardly violates the first sentence of the asylum statute, which provides that asylum's available whether or not at a port. And now this is confirmed both in the border NGO's amicus brief and in the government's own brief, which acknowledges that about 9 out of 10 people are being barred if they enter between ports. So if you look at the government's reply brief at pages 13 to 15, they acknowledge that the parole option isn't actually available to people at the border who are subject to the rule. They agree, as Judge Van Dyke, you were asking earlier, they agree that almost nobody has ever been able to show a transit country denial. That's page 685 of the supplemental record. And it shows that the last time that requirement was in effect, fewer than 2% of people were able to satisfy it, even over a 10-month period. And then they admit that only 1 in 10 people were able to satisfy the rule's emergency exception in the first month. And again, I believe that's page 47 of the record. So that means that 9 out of 10 people who don't go to a port of entry are being barred under this rule. 9 out of 10 people who use a method of entry that Congress explicitly authorized in the asylum statute, as this court put it in the prior case. And by the way, the border NGOs who are on the ground, they say the exact same thing. They say that in the first six months that the rule's been in effect, they're seeing hundreds and hundreds of people subject to the rule, and that of the people they're seeing, almost nobody can overcome this rule except by going to a port and waiting weeks or months for an appointment. Not to harp on it too much, but Your Honor's question about the transit country denial, the amicus brief says that they have seen zero people who are able to satisfy that exception in the first months of this rule. Does it make a difference if, you said 9 out of 10, what if it was just, what if it was 1 out of 10 only was being excluded? Does that make a difference, the numbers? Yeah, I'm glad you asked that, Your Honor. So I'm going to give two distinct answers to that. First of all, no. We don't think a broader exception would make a difference, because the rule would still be barring people on a basis that Congress rejected. So even if they took a smaller number of people and said, you're barred based on where you enter the country, that would still violate the text of 1158A1. Because it speaks in the singular, it says any person can seek asylum regardless of where that person entered the country. And so, yes, even if they barred a smaller amount of people for entering between ports, it would still violate the statute. But my second answer is that even without addressing that, it's clear that such a small exception as this one can't be what makes the difference to the rule's legality. Because otherwise, agencies could easily get around any statutory limit just by adding some tiny exception to the illegal rule. And case after case has said that. So in the transit ban case, like I said, there was a small exception. That obviously didn't affect this court's statutory analysis. In Gaul, the Supreme Court held explicitly that adding an exception for extraordinary circumstances does nothing to fix an illegal rule. The Third Circuit said that in Jiang, which is a very similar setup to this case, it said that small exceptions like this don't matter if the dominant effect of the rule is something that's contrary to statute. If I'm understanding the thrust of the argument with respect to point of entry, it appears to be that you're arguing the government is not allowed to attach disadvantage to a manner of entry that is explicitly permitted in the statute. Well, it can't bar people on that basis. But I think it may go more broadly than that. That is to say, if you're entitled to asylum or entitled to seek asylum, irrespective of where you enter, and that's what the statute says, can the administration attach disadvantage with respect to that application because of where you entered? I don't think so. I don't think so either. I mean, the statute puts them on equal footing. But if that's correct, that kind of goes back to my whole discretion question. If that was right, then it wouldn't. And I think actually the government does and has for some time said that they consider that as one of the factors for the exercise of the AG's discretion. So, is that correct? Like, it's just verboten? It's forbidden in order to, like, even consider the mode of entry even at that late? If it's forbidden in that sense that you were just talking about, then it would be forbidden even for the AG to take it into account. Like, the AG can't exercise the AG's discretion by engaging in, like, racist reasoning or something like that. So, I don't know how that's consistent with. Well, it's forbidden as an eligibility bar. I mean, the structure of the statute makes clear that the government can't correct an eligibility bar that bars people on a basis that Congress has said explicitly they can't. So, if you look at a similar provision, A-1 also says that people can seek asylum irrespective of their status, their immigration status. The government equally couldn't impose a bar that bars some people based on their status, and the statute explicitly addressed that. Congress spoke to specific reasons that it said were not good enough reasons to bar people from asylum at the time. By status, you mean, like, if they're in the country and they've overstayed their visa or something? Sure, different visa categories, what have you. And so, getting back to the 9 out of 10 point, so I'd say we have two answers there, which is that they really can't bar anybody based on their place of entry, so it wouldn't matter if it was an even bigger exception. But here, the exception is so tiny that it just can't matter. And I would say, you know, it's 8%, I believe, in the Nunez-Nato declaration. That's not 8% of all asylum seekers. That's 8% of the people who were desperate enough to test the exception in the first month, or I suppose who were desperate enough to test it at all and risk being deported to their home country. So, this really is a very small exception, and the rule makes that clear. I mean, it's for acute medical emergencies, severe human trafficking, threats that are both extreme and imminent at the time of entry. And page 31396 of the rule says that, as to safety in Mexico, that's the only, it uses the word only thing that the exception is for. When I read that, I mean, aside from like a medical emergency or something like that, it seemed to me that most of the other aspects that would entitle you to CAT or withholding, really. I mean, if you were so desperate that people are literally chasing you with, you know, and so it's that much of an emergency, then why wouldn't you be eligible for withholding or CAT in any event? And so, those exceptions don't seem to be doing much because, in my view, because those exceptions, you would get, you would be eligible for withholding. You'd be able to show over the 50 percent chance of serious injury or torture, you know, or CAT. I think that's absolutely right, Your Honor. I was surprised I didn't see, I don't believe in any of the briefing that I see that argument. Am I missing something? Is it that they wouldn't be able to present their CAT or withholding claim or something, or? I think the one thing that kind of complicates the picture is that CAT and withholding relief is as to a specific country. And so, if they're fleeing a threat on the border in Mexico, that doesn't necessarily speak to whether they could get withholding relief as to their home country. Because they'd get grabbed and sent back to, they'd get, they would be rescued from the threat at the border, but they would be sent back to their home country where they may have a different threat. Exactly. Gotcha. Exactly. And so, I'll just briefly turn to the government's argument about vacater. Remand without vacater is plainly not available here because the threshold requirement for that is that the government could easily fix the rule on remand and re-adopt the same rule. But that can never be the case where a rule violates the statute. Because that's just a hard limit on what the agency can do. And in the government's brief, I don't even see them to argue that if the rule violates the statute, that they could be eligible for remand without vacater. Same with our arbitrarian capricious claims, because those claims are that, one of the core justifications for the rule. Well, as I understood, I think their remand, I think one of their arguments at least was, listen, the plaintiffs here are not actual people that are being sent back. The plaintiffs are organizations. And so, maybe that whatever sort of vacature could be a limited vacature to the extent that it would affect people who were clients of these particular organizations. I think that was an argument they made, right? Yeah. So, they made a lot of different vacater arguments. So, to address that one, they don't identify any cases that perform that kind of narrow tailoring analysis in the vacater context. That's an injunction analysis. As to vacater, the practice and the precedent in this court and in every other circuit has been clear for decades, that courts never do that kind of injunction style tailoring analysis. If a rule is illegal, it gets vacated. That's the end of the story. Even if the court did look at that kind of analysis though, the prior cases already resolved that issue. Those involved injunction, so they did have to do the tailoring analysis. And what they said is that when a rule is illegal, that the government's interest in border management can't overcome the policy judgments that Congress made, and it can't override the interests of these plaintiffs' organizations and of thousands of asylum seekers at the border who are being stranded in some of the most dangerous cities in the world and who are being deported back to persecution or potential persecution in their home countries. So, there are two reasons, Your Honor. I don't think that that argument can succeed. You know, that analysis isn't available under vacater. Even if it were, this court has already resolved that question. And then I... Sorry. Let me just... You know, I've been... I sort of dug into this case. One thought that occurred to me was... So, the provision in the statute that allows for regulations that are not inconsistent with the asylum provisions, what could the government do? If anything, if it wanted to sort of put some order into the way people seek asylum? The government has a lot of options to help manage the border short of slashing asylum. I see my time's up. If it's okay to answer. Please answer. They can offer appointments on a voluntary basis. They can expand people's options to avoid the border altogether through visas, parole, refugee processing. They can send more asylum officers to the border to accelerate processing. They could have... They actually have just started now having asylum officers decide the merits of people's claims to accelerate adjudication. So they have lots and lots of options short of slashing the asylum system. The one thing they can't do is adopt substantive asylum bars that conflict with the language of the statute or that eliminate protections that Congress has written into the statute. That's not an available option to them. I have a follow-up question. I think it's very possible that our precedent doesn't... But if, say, we were to agree with the government on the Texas... U.S. versus Texas case and say these organizations don't have standing, what next? Is this case... Would this case just be dismissed or are there individuals that could step in as plaintiffs? This case only has organizations as plaintiffs. So, yes, the organizational plaintiffs do need to have standing. But this court addressed the exact same standing arguments before and it held... No, I know. I know. I'm just asking if you... Could you... If it turned out that the organizations didn't have standing, is the issues just go away or are there plaintiffs that could bring these claims? I suppose other people could bring the claims. I think people could certainly raise them defensively in their proceedings. So, you know, I'm not sure, Your Honor. But I think the main point to make, though, is that there's just no way Texas can overcome the court's prior precedent, especially under the military principle. I understand that. I was just asking... We're taking over your time, but I want to make sure that my colleagues have any further questions. All right. Well, I think they probably want to ask the government a few questions. Thank you, Your Honor. All right. Maybe we'll put on like four minutes or something. But we'll make sure we get all our questions answered. Thank you, Your Honor. A few points. It appears that the plaintiffs are now taking the position that any consideration of manner of entry is impermissible and is barred by the statute with respect to the exercise of the 1158B2C authority. That would be a pretty extraordinary proposition. This court didn't hold that. And, in fact, in the entry bar stay decision, the Judge Bybee decision, it makes very clear that the court was not saying manner of entry could never be considered. It says just the opposite. And, in fact, Your Honor, as you were noting, it's long been considered by the BIA as one of the factors that can be considered in whether to deny asylum. So I think that would be... No. Considered at the stage of discretion once eligibility has been determined? That's what the BIA Pula decision is doing. The discussion in this court's decision, the Judge Bybee opinion, I think is broader than that and says that this court is not saying it can't be considered even at the rule stage when the... The eligibility stage. Correct, Your Honor. And... How would that work, I guess, if you don't divide the world up into those two different categories? So I think... I mean, I'm just trying to figure out how would that work as far... And I'll give me plenty of time, so I don't want you to worry about it. But how could you take it into account but not as much as the prior entry rule that this court... You know, what would be at the eligibility stage? You'd be like, you know, you're presumptively not eligible and here's one other thing and so now... I'm trying to figure out how that would even work to take it into account in part but not... So I think it's very clear that it can be taken into account in part. And so the statute says that almost everyone can apply for asylum. It then says there's an eligibility determination. What this court previously found impermissible was saying that everyone who enters between a port of entry is ineligible for asylum because that seemed to negate the ability to apply for asylum. But there are all kinds of people who can apply for asylum under the statute but are not eligible because they fall within one of the eligibility bars. So the fact that someone can be barred from actually obtaining asylum yet still have a break into 1158 and it's well established. I think the history here of the exception, the 1158B2C exception, is important. The Refugee Act of 1980 didn't contain any bars. It just was a grant of discretion to the AG to provide for asylum or to withhold it even if someone was eligible. The AG then adopted a number of bars. Then in 1996 in IRIRA, Congress did three things. It codified all of the AG's bars that had been in place by regulation. It expressly granted authority to impose new limits or condition on asylum. And Congress added two new bars itself, the one-year bar and the successive application bar. Those two bars are important because they both deal with the systemic efficiency concern that I was raising earlier. The plaintiffs here, I think, are taking the position. So, yeah, that's an interesting history because it seems like it's very clear. And again, don't worry about the time because this is really important, I think. It seems like before Congress ever tried to put any bars in itself and it was just basically saying, hey, that's for the agency to figure out. At that point, the agency, it's not clear to me that our precedent in either Judge Bybee's or the later East Bay panel decision, it's not clear to me that at that stage of history that the rationale would apply that would say the agency can't do, can't say everybody's got to go through the port of entry. But then basically when Congress went and codified some of those and put them in the statute and then added the language, that's when they added the language consistent with, is when they did that? Correct. It granted the authority to impose new conditions or limits as long as they're consistent. Not consistent with, but the argument would be that Congress at that point created a more restrictive regime than what existed before by adding those words consistent with. Like before that, the AG had pretty broad authority to do things like establish eligibility. But after it said consistent with and provided some things, then that narrowed it. So there's no indication that I'm aware of in the legislative history or in the text that Congress thought it was constraining the Attorney General's authority in IRIRA. Instead, it was expressly codifying everything the AG had done before and saying going forward you can impose new limits. I understand what you're saying about consistency. So do you think, yeah, well, I'm not sure if I agree with our precedents that's reading of consistent with, but do you think, but it is what it is, right? And do you think that by consistent with, like what Congress may have been doing is say don't do less than what we've put these statutory bars in. Don't try to create, you know, give more eligibility than the limits we've already set. So that would read the authority, the B2C authority out of the statute. It says that the Attorney General can impose new conditions and limits beyond those that are in the statute. And Judge Pais, you asked the plaintiffs could you give us an example of some new limit that the departments could impose under the B2C authority. They didn't give any examples. They said you could do other things to expand pathways. That position would entirely read this provision out of the INA. It expressly gives the AG authority to impose new limitations. Let me ask you this. So in the regulation, in the explanation that was in the Federal Register, it talks about like imposing penalties if you don't go through. There was use of the word penalties I think in the Federal Register when I was reading it. Could they give incentives? So yes, I think the agencies could provide incentives. And I'm not sure that the rule does speak of penalties. I'd have to go back. But it talks about consequences. It talks about consequences. Consequences, which is another polite way of saying penalties. Fair point, Your Honor. The way the rule is designed, it is supposed to provide incentives and disincentives. These new, and some of these new pathways. What are the new incentives? So for example, the new parole pathway is a new incentive. It didn't exist before. It's a new creation by DHS to allow up to 360,000 people a year. But as a judge, as we just heard a few minutes ago by our presiding judge, it apparently existed before, right? So the parole authority has existed. This particular set of parole processes, which... There's a lot more slots. Dramatically, exactly, a certain number of slots. That's new, and that did not exist previously. I wanted to answer one question you asked, which is whether the rebuttal grounds for imminent and extreme danger are just coextensive with CAT and withholding. I agree with where you, in counsel for plaintiffs, came out. They're not the same thing, for the reason... Yeah, that was helpful, because the danger you may be experiencing is not actually from your home country. It's from Mexico, in theory. So, yeah, okay. That helped a lot. Correct. There's one final point I'd like to make. I'm happy to answer any further questions you might have. You've been very generous with your time. There's one final point I'd just like to make. If I have not convinced you to reverse the district judge, and I hope I have, but if I have not, we would ask that you leave in place the stay pending appeal that's currently in place. We understand that stay to run through issuance of the mandate, so that would be 52 days after a judgment. We have asked in our briefing that you extend that stay through consideration of any request for further relief that we might seek. The plaintiffs did not oppose that request for relief in the briefing, and so if you rule against us, we would ask that you extend that stay. I think he's saying they may ask for somebody else to weigh in on this, if we go a different way. Any further relief? Do you have some in mind? No, I think we understand. I saw that in your briefing. And I want to make sure my colleagues have any questions. All right, well, thank you, counsel. I appreciate the argument from both sides. It was actually very helpful. Thank you very much. Thank you, honestly. All rise. This court for this session stands adjourned.
judges: FLETCHER, PAEZ, VANDYKE